**Annie FORGASON, Appellant,**

v.

**Cynthia F. FORGASON, Appellee.**

**No. 07–94–0195–CV.**

Court of Appeals of Texas, Amarillo.

Dec. 11, 1995.

Rehearing Overruled Jan. 10, 1996.

---

Law Offices of Donald E. Cummings, Donald E. Cummings, Lubbock, for appellant.

Law Offices of Ronnie Phillips, Ronnie Phillips, Lubbock, for appellee.

Before DODSON, BOYD and QUINN, JJ.

QUINN, Justice.

Annie Forgason (Annie) initiated suit to divide marital property, post-divorce, and named Cynthia Forgason (Cynthia) as the sole defendant. The trial court entered judgment declaring that Annie take nothing. She appealed from that decree asserting ten points of error. For the reasons which follow, we overrule each point and affirm.

### Facts

Annie divorced Ted Forgason on April 17, 1979. To facilitate the proceeding, the couple executed an agreement incident to divorce proposing to divide their community estate. However, neither it nor the final decree of divorce addressed the disposition of an employment pension with AT & T "accumulated" by Ted during the marriage.[1] Instead, the documents awarded Annie various household furnishings, a 1968 Cadillac, savings accounts at Telco Credit Union and Security National Bank, her clothing and jewelry, and a "life estate in the home in which the parties resided prior to separation." Ted received a 1977 Chevy pick-up, a

---

1. In paragraph "V" of the Original Petition for Divorce Ted listed his "retirement" as a community asset. The two also discussed it while negotiating settlement of the community estate. Thus, its existence and potential for division was well-known.

savings account at Telco Credit Union, all U.S. Savings Bonds accumulated during the marriage, a gun case, and various other items of "personal nature to him."

As to the home in which Annie obtained a "life estate," Ted agreed to satisfy the mortgage payments which accrued monthly. The payments were to include monies sufficient to cover not only principle and interest accruing thereon but also ad valorem taxes and property insurance. The agreement further obligated him to buy and maintain a "mortgage cancellation insurance policy" on the realty until the mortgage was paid.

In November of 1985, Ted retired and began receiving payments under the aforementioned pension. By that time, he had married Cynthia. In effort to provide for his new wife's care upon his death, Ted, prior to retirement, bought a "survivorship annuity" from his employer and named Cynthia its beneficiary. So acquiring the annuity reduced the monthly retirements benefits he would receive by ten percent.

Ted died in May of 1991. Soon thereafter, Cynthia began receiving, and continues to receive, $433.34 a month as a result of the annuity. In 1991, AT & T also paid the lump sum of $28,194.71 to her as a "death benefit." The latter arose from terms in the company's pension plan which entitled the company to pay a "mandatory beneficiary ... *Sickness Death Benefit[s]* equal to one year's pay." (Emphasis in original). Furthermore, the plan defined "mandatory beneficiary" as the

> legal spouse, if living with [the decedent] at the time of ... death[,]
>
> unmarried dependent children up to age 23 (age 23 or over if disabled and incapable of self-support) [and]
>
> dependent parent living with [decedent] ... or in a separate household that [decedent] provide[s] in the vicinity of [decedent's] home.

As previously mentioned, Annie sued to collect her supposed pro rata share of both the annuity and death benefit disbursed after Ted's death. Claim to retirement payments disbursed prior to his death was waived.

## Points of Error

### A. Points Seven, Eight, Nine and Ten

■ We address Annie's points of error in their logical progression. Points seven through ten dispute the application of section 3.91 of the Texas Family Code and the court's authority to divide the property other than in a pro rata way.

It is rather obvious that the trial court relied upon section 3.91 of the Family Code to resolve the controversy for it referenced the statute in its conclusions of law. In doing so, however, it did little more than follow the representations of Annie. She alleged in her original petition that "this [was] a suit for division of property under Section 3.90 *et. seq.,* [of the] Texas Family Code." (Emphasis supplied).[2] She further argued, in a letter brief dated February 12, 1993, and filed of record, that sections 3.90 and 3.93 of the Code supported her recovery of both the property and attorney's fees. Having so invoked the provisions of Subchapter F of Chapter 3 of the Texas Family Code, she cannot later decry their application or argue them to be unconstitutional.

Alternatively, the allegations of inapplicability and unconstitutionality went unmentioned below. Neither were raised until after entry of judgment and perfection of appeal. Thus, we must deem the contentions waived. *Tex.R.App.P.* 52(a). Yet, even if not waived, it is clear that the legislature intended 3.91 to apply to this case. It specifically dictated that "[t]he amendment that added Subchapter F to Chapter 3, Family Code, ... applies to decrees of divorce and annulment rendered *before, on, or after* November 1, 1987." 71st Leg., Reg.Sess., *Gen. & Spec.Laws of Texas,* Ch. 371, § 10(b) (1989) (emphasis added); *Haynes v. McIntosh,* 776 S.W.2d 784, 786 (Tex.App.—Corpus Christi 1989, writ denied). "No exceptions were listed." *Haynes v. McIntosh,* 776 S.W.2d at 786.

■ Additionally, the authority under 3.91 to "divide" property is the authority to effect its partition. *See Cameron v. Cameron,* 641

---

2. The term "et seq." means "and the following." *Black's Law Dictionary* (6th ed. 1990). Annie's use of it, therefore, can reasonably be construed as alleging that her case arose not only under section 3.90 of the Family Code but also the following sections, that is, 3.91, 3.92 and 3.93.

S.W.2d 210 (Tex.1982) (addressing the "just and right" provision found in section 3.63 of the Family Code). In partitioning the asset among the ex-spouses, it does not divest either of title. *Id.* Rather, it "dissolves the tenancy in common," according to the Texas Supreme Court, and apportions the asset among the tenants. *Id.* It does not legally divest anyone of title to the asset. *Id.* This and the fact that Annie sought the "division" of property she acknowledged was held as tenants in common compels use to hold 3.91 of the Family Code constitutional.[3]

■ Given the applicability of section 3.91 to the pending matter, we now turn to its wording. It directs the trial court to divide the subject asset in a "just and right" manner. *Tex.Fam.Code Ann.* 3.91(a) (Vernon 1993). That standard implicitly encompasses the power to divide in less than an equal way. *In re Moore,* 890 S.W.2d 821, 840 (Tex. App.—Amarillo 1994, no writ); *see Haynes v. McIntosh,* 776 S.W.2d at 786 (noting that the statute eliminated the restrictive 50/50 or comparable split such as that sought by Annie). Depending upon the facts of each case, the court may validly apportion some, all or none of the asset to any particular party. Thus, we reject the proposition that the trial court had to award Annie, as a matter of law, one-half of the retirement benefit accruing while she and Ted were married.

### B. Points One, Two, Three, Four, Five, Six, Eight, and Nine

■ Next, Annie attacks the final judgment as an abuse of discretion. Underlying this assertion is the argument that few if any of the court's findings enjoyed legal or factual support. We again disagree.

■ To secure reversal on the basis of abused discretion, an appellant must show that the division adopted by the trial court was "manifestly unjust." *Kuehn v. Kuehn,* 594 S.W.2d 158, 161 (Tex.Civ.App.—Houston [14th Dist.] 1980, no writ). This is a heavy

burden. Attempting to gain reversal by attacking the court's fact findings, as Annie did here, does not necessarily result in victory even if the findings were inaccurate. *Id.* at 161–62; *Preston v. Preston,* 453 S.W.2d 389, 391–92 (Tex.Civ.App.—El Paso 1970, no writ). In that situation, the appellant must not only present evidence establishing the true value of the property but also prove that the ultimate division, as reappraised, remained manifestly inequitable. *Id.; Hammonds v. Hammonds,* 583 S.W.2d 807, 809 (Tex.Civ.App.—Dallas 1979, writ dism'd). In other words, it is not enough to merely point out inaccuracies in the court's findings.

As previously mentioned, Annie endeavored to secure reversal by attacking the sufficiency of the court's findings. In particular, she contended that those concerning the value of the property awarded each litigant in the 1979 divorce lacked legal and factual support, as did the ruling that Ted incurred the obligation to pay the mortgage previously mentioned and expended over $28,000 in doing so. With regard to the latter, Annie ignored the "Agreement Incident to Divorce" signed in 1979 as well as her own trial testimony admitting that Ted not only undertook the duty to pay the home mortgage, taxes, and insurance but also completely performed it. So too did she ignore Cynthia's testimony describing the number and amount of monthly payments made. According to Cynthia, the amount was anywhere from $150 to $210 per month. Multiplying both sums by 144, that is, the twelve payments per year for the twelve years in which they were made, reveals evidence of payments totaling between from $21,600 to $30,240. So, the findings that Ted not only assumed the debt but also expended in excess of $28,000 in performing were legally and factually supported.

Unlike the aforementioned, the findings concerning the total value of the property granted each spouse through the "Agreement Incident to Divorce" were inaccurate.

---

**3.** We acknowledge that the rule has the practical effect of denying one ownership, especially when the court in partitioning the asset award it to one co-tenant in its entirety. Yet, the law is wrought with legal fictions with which we must abide. Since the fiction here involved was created by

The appellate record reveals that neither litigant below offered testimony as to the amount of money in the Telco savings account given Ted, or the market value of the 1977 pick-up, the gun case, the personal items, or the AT & T stock he supposedly received.[4] Similarly lacking was evidence concerning the value of Annie's life estate in the home, that is, the value of her being able to live in the house free of charge for the rest of her life. Yet, therein lies the rub. Without evidence reflecting the value of the property previously divided, we cannot determine whether the division here pertinent was manifestly unjust, and it was incumbent on Annie to present that evidence. *Kuehn v. Kuehn, supra; Preston v. Preston, supra;* and *Hammonds v. Hammonds, supra.*

Furthermore, other than to generally decry the failure to receive a pro rata share of either the annuity payments or death benefit, Annie nowhere illustrated how the division was unjust. Again, she was not entitled to a certain percentage as a matter of law since that theory was eliminated with the passage of section 3.91 of the Family Code. *In re Moore, supra.* Her failing to illustrate injustice, stays our hand.[5]

Thus, we affirm the judgment rendered below.

---

the Texas Supreme Court, we are bound to follow it.

4. Interestingly, the "Agreement Incident to Divorce" mentions nothing of AT & T stock.

5. It also relieves us from addressing the dispute involving whether the death benefit was truly an optional discretionary benefit. Even if it were, we could not fault the court for refusing to grant Annie a part thereof since she has yet to prove the judicial decision to be unjust. Similarly, whether the finding that purchasing the annuity cost $5,530.18 is factually deficient is also irrelevant given this.